IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| GARY L. QUIGG,<br><br>Plaintiff,<br><br>vs.<br><br>SHERIFF MIKE LINDER; ANGELA NIESS, LPN; VICTORIA SCOTT, LPN; CHRISTOPHER CARUSO, PA; and FELICIA KELLY, RN,<br><br>Defendants. | CV 17-00035-GF-BMM-JTJ<br><br><br>ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |

Pending are Defendants' Motions for Summary Judgment (Docs. 89, 94, 125), Mr. Quigg's Motion for Partial Summary Judgment (Doc. 104), Defendant Kelly's Motion to Compel (Doc. 123), Mr. Quigg's Motion to Strike the Motion to Compel (Doc. 129), Mr. Quigg's Motion to Strike (Doc. 141), and Defendants Caruso, Niess, and Scott's Motion to Strike Plaintiff's Declaration Submitted in Support his Position in the Statement of Disputed Facts (Doc. 145).

Defendants' Motions for Summary Judgment should be granted, Mr. Quigg's Motion for Summary Judgment should be denied, and this matter should be dismissed.  The remaining motions will be denied as moot.

## I.  STATEMENT OF CASE

Mr. Quigg's claims involve three incarcerations at Yellowstone County

1

Detention Facility (YCDF):  the first from September 15, 2015 until October 8, 2015 ("Incarceration One"), the second from December 29, 2015 until January 21, 2016 ("Incarceration Two"), and the third from June 27, 2017 to July 13, 2017 ("Incarceration Three").

Mr. Quigg alleges Defendants Nurse Vicki Scott, Nurse Angela Niess, P.A. Caruso, Nurse Kelly, and Sheriff Mike Linder violated his Eighth and Fourteenth Amendment rights by refusing to give him his prescribed medications and attempting instead to give him completely ineffective substances.  (Second Amended Complaint, Doc. 25 at 17; Supplement to Complaint, Doc. 71-1 at 4.)

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such

2

materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B). Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To establish the existence of this factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed.R.Civ.P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

4

Defendant advised Mr. Quigg of the requirements for opposing a motion

brought pursuant to Rule 56 of the Federal Rules of Civil Procedure in their

"Notice and Warning to Plaintiff" (Docs. 88, 101, 128).  *See Rand v. Rowland*, 154

F.3d 952, 957 (9th Cir.  1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th

Cir.  1988).

## III.  FACTS

### A.  Medication Policies

#### 1.  Inappropriate Medications at YCDF Policy

At the time of Mr. Quigg's incarcerations at YCDF, a policy was in place

entitled "Inappropriate Medications at YCDF."  The Policy prohibited the

administration of certain medications at YCDF absent certain circumstances

identified in the Policy.  Specifically, the Policy provided:

> Some medications are inappropriate for the incarcerated individual
> due to potential abuse and may be used by inmates to help maintain
> their drug addiction while incarcerated.  Some medications may place
> inmates at risk as they may be asked to sell, trade or share with other
> inmates.  With many drugs that are commonly prescribed on the
> outside, while incarcerated, the risks may outweigh the benefit that the
> inmate might derive from them.  For this reason and because there are
> federal inmates at YCDF that must follow a specific formulary, the
> following medications will not be allowed at YCDF (unless
> specifically ordered by the provider).

(Doc. 93-1 at 1.)  The Policy also provides that, "an inmate who presents with an

acute problem (facial fracture, s/p surgery, etc.) may receive an opioid or other

disapproved medication as prescribed."  (Doc. 93-1 at 2.)  The Policy lists

disapproved medications by brand name, including Percocet, morphine, OxyContin, and Soma.  The medications Mr. Quigg sought were on the list of disapproved medications.  Mr. Quigg was repeatedly told that the medication he sought was "not allowed in this facility."  (Medical SUF at ¶ 12.)

YCDF Medical Staff, including Defendants Niess, Caruso and Scott, were obligated to comply with the Inappropriate Medications Policy.  (Medical SUF at ¶ 14.)

### 2.  RiverStone Health's Standing Order—Opioid Withdrawal

In addition, RiverStone Health had a Standing Order - Opioid Withdrawal in effect during Mr. Quigg's incarcerations.  Employees of RiverStone Health providing care to inmates at YCDF were expected to follow the Standing Order. (Medical SUF at ¶ 16.)  This Standing Order set forth a procedure for opioid withdrawal which included monitoring the inmate for signs and symptoms of withdrawal including:  agitation, anxiety, muscle ache, diaphoresis, rhinorrhea, and insomnia, and, later, abdominal cramping, diarrhea, nausea/vomiting, tremors, muscle spasms, tachycardia, and hypertension.  The Standing Order explained that symptoms may occur as early as three hours after last dose and may last for several days.  (Medical SUF at ¶ 17.)

### B.  Incarceration One--September 15, 2015 - October 8, 2015

Mr. Quigg was called into his parole officer's office on September 15, 2015

between 5:30 and 6:00 p.m.  He was arrested about 30 minutes later and transferred to YCDF for suspicion of illegal drug use or possession.  These charges, when proven, violated the terms of his parole.  He remained at YCDF from September 15, 2015 until October 8, 2015, when he was transferred to Montana State Prison (MSP).  (Defendants Niess, Scott and Caruso's Statement of Undisputed Facts, Doc. 96 (hereinafter Medical SUF) at ¶ 5.)  Mr. Quigg was in state custody during Incarceration One.  (Medical SUF at ¶ 6.)

An initial intake is completed for each new inmate who arrives at YCDF. (Medical SUF at 18.)  Deborah Thompson completed Mr. Quigg's Initial Intake on September 15, 2015 at YCDF.  (Medical SUF at ¶ 19.)  When he arrived at YCDF, Mr. Quigg had prescriptions for Percocet and Soma from his treating physician. (Linder SUF at ¶ 4.)  He had taken his medication before work that morning.  Mr. Quigg had taken prescription opioid pain medication "in one form or another" since the 1980s for back pain.  He had back surgery in 2011 but continued to take opioid pain medication after his surgery, continuing until the morning of September 15, 2015.  (Medical SUF at ¶ 9.)

Ms. Thompson documented that Mr. Quigg did not have "Drug/Alcohol withdrawal symptoms" at his Initial Intake.  (Medical SUF at ¶ 20.)  Mr. Quigg does not recall the initial intake process and has no recollection of pain or withdrawals at his initial intake.  (Medical SUF at ¶ 21.)  The intake form indicates

that Mr. Quigg signed a request for information (ROI) presumably for his pharmacy and medical provider.  (Doc. 96-4 at 1.)  His heart rate was normal, his breathing was normal and not fast, he was able to speak in full sentences, had a "pleasant, normal interaction," he was "alert and orientated," his train of thought was normal and fluent, and his gait was normal.  (Medical SUF at ¶ 22.)  Mr. Quigg's initial intake was signed at 12:47 a.m. on September 16, 2015.  (Medical SUF at 23.)

Mr. Quigg completed two medical request forms on September 16, 2015. One request sought aspirin.  Nurse Kelly responded, "As soon as we get your medical records we will start all of your meds that are allowed here.  Narcotics are not allowed."  (Doc. 96-5.)  Mr. Quigg's other medical request sought his pain medications and he explained that the lack of those medications causes diarrhea, increased blood pressure, and difficulty moving due to pain in his back, hips, and shoulders.  (Doc. 96-6.)  Nurse Kelly responded:  "See previous kite.  Already addressed."  (Doc. 96-6.)

On September 17, 2015, Nurse Scott signed a telephone encounter note regarding a medication verification for Mr. Quigg.  The message stated:

> Nursing called CVS Pharmacy per signed ROI.  Spoke to TAMI tech.
> Im has opioid meds and SOMA current and 2 cardiac meds IM's
> family brought in medications and appropriate medications for YCDF
> were entered onto MAR.  IM reports he takes opiates -He will be put
> on SO for opioid withdrawal.  He C/O diarrhea this am so was
> administered Loperamide at am med pass.

8

(Doc. 93-4.)

On September 29, 2015, Angie Niess indicated that Mr. Quigg was started on a three-day trial of omeprazole and reported good results and would like to continue.  PA Caruso continued the omeprazole and it was added to Mr. Quigg's medication administration record (MAR).  (Medical SUF at ¶ 39, Doc. 96-9.)

On October 1, 2015, Erin Mosness, a nurse at YCDF, asked PA Caruso if Mr. Quigg could continue taking omeprazole because it had been discontinued in the MAR and it was beneficial to him.  She also asked if she could start loperamide for diarrhea because it had helped him before.  (Doc. 96-7.)  Pursuant to her request, omeprazole was continued and loperamide was initiated.  (Medical SUF at ¶ 28.)

Mr. Quigg claims he completed other medical request forms during Incarceration One, but "doesn't have a clue" where they are.   He would "guess" there are four or five other medical request forms he completed during Incarceration One.  (Medical SUF at ¶ 26.)  There is no evidence in the record regarding what information was contained in those medical requests.

### C.  Incarceration Two--December 29, 2015 - January 21, 2016

A federal Writ of Habeas Corpus ad Prosequendum was issued for Mr. Quigg on December 4, 2015.  *United States v. Quigg,* 15-cr-147-BLG-SPW, Doc. 10.  Mr. Quigg was taken out of state custody at MSP, placed into the custody of

9

the United States Marshal Service (USMS), and transferred to YCDF on December

29, 2015.  He remained at YCDF for Incarceration Two until he was transferred to

Crossroads Correctional Center on January 21, 2016.  (Medical SUF at ¶ 7.)

While at MSP, Mr. Quigg had been administered OxyContin and Soma and

he had written prescriptions for these medications upon his arrival at YCDF on

December 29, 2015.  (Medical SUF at ¶ 44; Linder SUF at ¶ 7.)  He had not been

administered his medication since the day before he arrived at YCDF, or December

28, 2015.  (Medical SUF at ¶ 45.)

Nurse Scott completed Mr. Quigg's initial intake on December 29, 2015.

She indicated no health concerns or obvious injuries, but that Mr. Quigg had

mobility restrictions in that he could not do stairs, he needed hip replacements, and

had a bad back.  Mr. Quigg's listed medication on the initial intake were

"Lisinopril, albuterol, Fosamax, vitamin D, calcium, OxyContin, and Soma."

(Medical SUF at ¶ 48.)  Nurse Scott indicated that upon intake Mr. Quigg's vitals

were normal, he was alert and orientated, had a normal train of thought, was fluent,

alert, and his gait was normal.  (Doc. 96-10.)  Mr. Quigg's vitals were normal on

December 29, 2015.

Mr. Quigg did not report severe pain at the time of his initial intake on

December 29, 2015 and he did not exhibit any objective pain behaviors Nurse

Scott typically sees when inmates are in severe pain such as grimacing, groaning,

difficulty moving, antalgic gait, increased heart rate, anxiety, or agitation.

(Medical SUF at ¶ 51.)  In addition, Mr. Quigg did not exhibit signs of drug

withdrawal such as sweating, anxiety, increased heart rate, tachypnea, or muscle

aches.  (Medical SUF at ¶ 52.)

Nurse Scott Miller also saw Mr. Quigg on December 29, 2015.  The reason

for the appointment with Nurse Miller was "Rx:  Oxycontin -- Soma."  Nurse

Miller signed a note at 3:43 p.m. on December 29, 2015 which stated:

> The following 2 written prescriptions were received at Mr. Quigg's
> intake.
> 1.  OxyContin 20mg, 1 tab PO q 12 hrs, #60
> 2.  Soma 350mg, 1 tab PO BID, #60
> These meds were not transported with the IM but arrived in written
> form only.
> These written prescriptions were placed in the Supervisor's Narcotic
> Lock Box.
> Neither of these meds were ordered or placed on IM's MAR.

(Doc. 96-11; Medical SUF at ¶ 56.)

There is evidence in the record that Mr. Quigg completed two medical

request forms during Incarceration Two.  The first is dated December 29, 2015,

and states:  "Need to see the YCDF medical doctor.  A Nurse, who does not have

Rx authority has overridden a medical doctor's Rx and I am in severe pain with

withdrawals from Rx meds."  (Medical SUF at ¶ 62.)  The response to the medical

request form states:  "Ibuprofen and Tylenol available from the canteen.

Withdrawl [sic] from what meds?"  (Medical SUF at ¶ 63.)  There is no evidence

Mr. Quigg responded to the nurse's inquiry.  The signature on the response to this request is not Angela Niess's.  (Medical SUF at ¶ 65.)  Nurse Niess testified that her colleague Amanda (who is not a named defendant) signed this request form. (Niess Affidavit, Doc. 97 at 4, ¶ 14.)

Mr. Quigg completed a second medical request form on January 1, 2016 which stated:  "Need to see MD severe pain/muscle cramps – withdrawal Rx meds issued by DOC MD & brought to YCDF with me.  Can't use Ibuprofen – stage 3 kidney disease.  Tylenol has no affect and causes additional liver damage.  Would be like using bandage for amputated limb."  The response to the medical request states "The pain medication scripts that you came in with are not allowed here at facility.  You have been scheduled to be seen.  Thank you."  (Medical SUF at ¶ 66; Doc. 96-13.)  Again, Nurse Niess testified that her colleague Amanda (who is not a named defendant) signed this request form.  (Niess Affidavit, Doc. 97 at 4, ¶ 14.)

On January 5, 2016, the USMS requested information on Mr. Quigg's medications.  USMS "was informed that YCDF does not administer Narcotics or sleep aids;" and those were the medications that Mr. Quigg was complaining that he was not receiving.  The record was electronically signed by Nurse Scott and the provider was listed as PA Caruso.  (Doc. 106-2 at 6.)

Mr. Quigg submitted an inmate complaint form which is dated March 4, 2016 and the response is dated January 11, 2015.  It appears, however, that this

form was misdated because Mr. Quigg was not incarcerated at YCDF on March 4, 2016 or January 11, 2015.  For purposes of this Order the Court will presume the complaint was written in January 2016.  On this form Mr. Quigg made the following complaint:

> For many years, I have been prescribed medications for severe back, neck, hip, and shoulder pain by my family MD, surgeons, PA and lastly, an MD for DOC.  I brought Rx meds from the prison a week ago and medical refuses to give them to me.  "Deliberate Indifference to serious medical needs."  Kevin Gillam at County Attorney's Office has additional details and controlling case law.  Need to exhaust remedies before filing suit in fed. Court.  Pain renders me unable to assist in preparing a defense to charges.  Pain takes away ability to concentrate.

Mr. Quigg requested the following relief:  "Require nurses to provide Rx meds prescribed to me by M.D."  Nurse Scott gave the following response: "IM did not arrive with Rx pain meds, he arrived with a written prescription for a narcotic medication that is not permitted at YCDF for chronic pain (i.e. "many years")."  The action taken is listed as:  "IM is scheduled to be seen by YCDF medical provider for review of medications."  (Doc. 93-9.)

Mr. Quigg had an appointment with PA Caruso and Dr. Joy Welty in the clinic at YCDF on January 12, 2016.  (Medical SUF at ¶ 73.)  PA Caruso took a history regarding Mr. Quigg's use of opioid medication and pain.  Mr. Quigg reported he had been taking narcotic pain medication for chronic back pain since 1993.  Mr. Quigg was not administered narcotic pain medication at YCDF per "jail

policy."  (Medical SUF at ¶ 74.)

The clinical notes on that visit state:

Inmate has initiated a Deliberate Indifference charge against the jail
because he has not been given narcotics per jail policy despite getting
narcotic maintenance at the prison.  We have no medical records from
the prison or his PCP.  Today, he was offered Neurontin and Flexeril,
both of which are appropriate to treat chronic pain, but he refused
both.

(Doc. 96-14 at 2.)

According to PA Caruso, patients with severe and debilitating pain tend to

breath fast and shallow, have an elevated heart rate, grimace in pain, and

demonstrate an abnormal gait.  When a patient has back pain, PA Caruso often

observes that they have difficulty finding a comfortable position.  (Medical SUF at

¶ 75.)  PA Caruso did not note any objective signs or indicators of severe pain

when he saw Mr. Quigg on January 12, 2016.  In addition, Mr. Quigg's vitals were

normal, his gait was normal, and he was able to converse and appropriately answer

PA Caruso's questions.  PA Caruso also documented Mr. Quigg's physical

examination which revealed no edema in his extremities.  (Medical SUF at ¶ 76.)

PA Caruso offered Mr. Quigg Neurontin and Flexeril, both of which PA

Caruso contends are appropriate for the treatment of chronic pain.  Mr. Quigg

refused the medication.  Mr. Quigg testified that he "was not going to chew my

cabbage twice and go back to second grade again when I've been to college."

(Medical SUF at ¶ 77.)  Mr. Quigg contends he had tried both medications

14

previously and they were ineffective for pain control.  (Doc. 139 at 43.)

Defendants point out, however, that Mr. Quigg testified that he had tried Neurontin

"years before" when he was at MSP and it was not effective.  But the last time Mr.

Quigg was at MSP was before his 2011 back surgery.  Mr. Quigg tried both

Flexeril and Neurontin while incarcerated at MSP in the 1990s.  (Medical SUF at ¶

78.)

Based on Mr. Quigg's clinical presentation on January 12, 2016, PA Caruso

did not believe Mr. Quigg's medical condition was serious and determined that the

administration of narcotic or opioid pain medication was not appropriate given the

chronicity and nature of Mr. Quigg's complaints.  (Medical SUF at ¶ 79.)

### D.  Incarceration Three—June 27, 2017 – July 13, 2017

Mr. Quigg alleges Nurse Kelly responded to his medical request form dated

July 6, 2017 wherein he reported severe, chronic pain.  Nurse Kelly admits Mr.

Quigg sought medication for his chronic pain, that she advised him that morphine

and OxyContin were not allowed at YCDF, and that ibuprofen and Tylenol

(NSAIDs) were available from the canteen.  (Kelly Affidavit, Doc. 127-1 at ¶¶ 7-

10.)

## IV.  ANALYSIS

Mr. Quigg alleges that when he arrived YCDF on September 15, 2015,

Nurse Vicki Scott took custody of his pain medications (morphine and

carisoprodol (Soma)) and refused to give him those medications while he was at YCDF.  (Second Amended Complaint, Doc. 25 at 6.)  He contends he suffered from withdrawals of his pain medications and was in severe pain from September 15, 2015 until his transfer to MSP on October 8, 2015.

When he was returned to YCDF from MSP on December 29, 2015, Mr. Quigg alleges MSP medical staff gave the transport officer two bottles of his prescription medications prescribed by a DOC doctor for oxycontin and carisoprodol plus two paper prescriptions for refills of these medications.  He contends Defendants Scott and Caruso refused to give him these medications and he again went through withdrawals and was sick and in severe pain until he was transferred to Crossroads Correctional Facility in mid-January 2016.  (Second Amended Complaint, Doc. 25 at 7.)

Finally, Mr. Quigg alleges that on July 6, 2017, Nurse Kelly responded to his Medical Request Form reporting severe chronic pain.  Nurse Kelly responded by allegedly criticizing Mr. Quigg for not taking NSAIDS and claiming that morphine and OxyContin were not allowed in YCDF.  He claims he also submitted another inmate complaint to Sheriff Linder and Captain Bofto which was intercepted by Nurse Kelly who again told Mr. Quigg that Tylenol and ibuprofen were available from the canteen, that Mr. Quigg had refused NSAIDS from Crossroads, and that narcotics were not allowed at YCDF.  (Supplement to

16

Complaint, Doc. 71-1 at 4.)

The Court construes two issues in this matter:  (1) whether YCDF's Inappropriate Medication Policy was unconstitutional as written; and (2) whether the YCDF's Inappropriate Medication Policy was unconstitutional as applied.  The Court finds Mr. Quigg has not met his burden with regard to either issue.

### A.  Policy

Mr. Quigg argues the Inappropriate Medication Policy at YCDF policy is unconstitutional on its face because it was established for non-medical reasons and it did not allow Mr. Quigg to have particular medications.  This is the basis of Mr. Quigg's motion for summary judgment which should be denied.

The penological justification for the policy is set forth in the policy itself where it states:

> Some medications are inappropriate for the incarcerated individual due to potential abuse and may be used by inmates to help maintain their drug addiction while incarcerated.  Some medications may place inmates at risk as they may be asked to sell, trade or share with other inmates.  With many drugs that are commonly prescribed on the outside, while incarcerated, the risks may outweigh the benefit that the inmate might derive from them.

(Doc. 93-1 at 1.)  Defendants' expert testified that these were legitimate penological reasons for the Inappropriate Medications Policy and that it was consistent with other jail settings and is standard in the industry.  (McMunn Affidavit, Doc. 99 at ¶ 12.)

PA Caruso testified that his understanding of the Inappropriate Medications Policy was that the listed medications were not to be prescribed absent limited circumstances such as acute fractures, recent surgery, or a recent trauma.  In those limited circumstances a narcotic pain medication could be prescribed by a physician or a mid-level provider.  (Caruso Aff., Doc. 100 at ¶¶ 14-15.)  He testified that the Policy is consistent with his knowledge, experience, and training as a physician's assistant.  He testified that if an inmate had an acute injury or condition, he would see the patient at the YCDF clinic, assess the inmate, and discuss the inmate and his thoughts with his supervising physician if necessary. (Caruso Affidavit, Doc. 100 at ¶ 16.)

A medication policy is unconstitutional when it is "[a] blanket policy denying narcotic pain medication to inmates in the general population regardless of medical need..." *Franklin v. Dudley*, No. 2:07-CV-2259 FCD KJN, 2010 WL 5477693, at *7 (E.D. Cal. Dec. 29, 2010), adhered to, No. 2:07-CV-2259 KJM KJN, 2011 WL 2493770 (E.D. Cal. June 22, 2011).

Mr. Quigg cites to a number of cases finding that blanket no-narcotics policies which prohibit various medications without exceptions and without allowing for the discretion of medical providers would be considered unconstitutional.  *See McAdoo v. Martin*, 2017 U.S. Dist. LEXIS 40009, 2017 WL 1091348 (W.D. Ark. 2017)(emergency room doctor prescribed hydrocodone for

dislocated shoulder and jail refused to fill prescription because jail policy (which involved no exercise of medical judgment) banned all narcotic drugs. No assessment of Plaintiff's pain level was attempted, no medical judgment was exercised.), *affirmed in part, reversed in part McAdoo v. Martin*, 899 F.3d 521 (9th Cir. 2018); *Scott v. Campbell*, 2009 U.S. Dist. LEXIS 85503, 2009 WL 3028306 (N.D. Fla. Tallahassee Div. 2009)(Private physician prescribed narcotic medications, but jail nurse refused to provide. Issue of fact regarding whether there was a policy disfavoring narcotic medications even when medically indicated.); *Johnson v. Pettis County Jail*, 2008 U.S. Dist LEXIS 21795 (W.D. Mo. 2008)(inmate with fractured pelvis was treated with Percocet and morphine in hospital but only given ibuprofen and Tylenol at jail. Plaintiff's expert testified that ibuprofen and Tylenol would not be adequate or appropriate to control Plaintiff's pain.); *Guilliams v. Helder*, 2018 U.S. Dist LEXIS 18350, 2018 WL 709966 (W.D. Ark. 2018)(denying Defendants' motion for summary judgment finding that Defendant appeared to have followed the facilities' ban on narcotics without considering the fact that narcotic medication was prescribed by other physicians or whether some form of narcotic medication was necessary to treat the level of pain being suffered by the Plaintiff.); *Strahan v. Rottnek*, 2015 U.S. Dist LEXIS 5864, 2015 WL 249448 (E.D. Mo. Jan. 20, 2015) ("Because Dr. Rottnek's policy was applied to plaintiff without any medical determination regarding

19

plaintiff's medical need for narcotic prescription medication for his chronic pain,

the policy had the effect of denying plaintiff medical treatment."); *Norris v. Frame*,

585 F.2d 1183 (3rd Cir. 1978)(Decision to discontinue methadone treatment

previously prescribed for Plaintiff violates a pre-trial detainee's right against being

subjected to punishment "unless the state can demonstrate that a legitimate security

concern or a genuine fear of administrative disruption warrants such."); *Tatum v.*

*Helder*, 2017 U.S. Dist LEXIS 25448, 2017 WL 707499 (W.D. Ark. Feb. 1,

2017)(Court denied immunity and summary judgment to defendants saying, " . .

there are genuine issues of material fact as to whether [defendants] had a policy,

practice or custom of not prescribing narcotic pain medications to inmates "); *Bahr*

*v. Winnebago Cnty*, 2017 U.S. Dist. LEXIS 115867, 2017 WL 3158760 (July 25,

2017)("The denial of a narcotic pain medication when it is medically necessary

could reasonably be expected to lead the person to suffer undue pain for the lack of

effective treatment for the underlying pain, as well as a result of suddenly stopping

a long-term narcotic medication."  Summary judgment subsequently granted to

defendant in 2018 WL 3474072 (E.D. Wisc. 2018)); *Stone v. Worcester County*

*Sheriff's Office,* 2019 U.S. Dist LEXIS 49974, 2019 WL 1367768 (D. Mass Mar.

26, 2019)(Court denied defendants' motion to dismiss when the jail claimed that

Klonopin had been removed from the jail's formulary.  The Court noted that the

defendants were using "non-medical reasons" for denying the medication.

Prohibiting particular pharmaceuticals known to effectively treat serious medical conditions is deliberate indifference.  An allegation that an institution's top official prohibits a particular pharmaceutical that is known to treat a serious medical condition, without ensuring that a viable alternative is available, sufficiently pleads deliberate indifference to the serious medical need of an inmate.); *Grawcock v. Hodges*, 2012 U.S. Dist. LEXIS 109890 (N.D. Ind.)("That certain medical conditions sometimes warrant narcotic pain medication means that such medications are something more than just luxury.  Strict adherence to a policy that bans narcotic medications raises a question of fact as to whether the denier was deliberately indifferent to a serious medical need and whether having a policy against narcotic medications violates constitutional rights."); *Blake v. Holly*, 2010 U.S. Dist LEXIS 101982, 2010 WL 3829197 (W.D. Ark. Aug 6, 2010)(jail had policy to not provide narcotic medications for pain relief which was applied without regard to the medical condition of the inmate.).

But the policy at issue was not a blanket prohibition on the administration of certain medications, including opioids.  Although the policy generally prohibited these medications, it specifically allowed for them to be ordered by the medical provider at the Facility. (Doc. 93-1, p. 1 "the following medications will not be allowed at YCDF (unless specifically ordered by the provider).")  The policy also had provisions allowing for the tapering of generally prohibited medications,

which would require the administration of the medication to do so.  (Doc. 93-1 at

2.)  The policy also specifically noted that opioids may be needed for treatment for

acute problems and such prescriptions could be administered.  *Id.*  If contract

medical staff believed a prohibited medication would be necessary for the

treatment of an inmate, they could request the medical provider to order its

administration.  The policy would not prevent the provider from doing so.

Although the medical staff did not invoke the exceptions to the general prohibition

when treating Mr. Quigg, it does not render the policy a blanket prohibition.

Because the policy at issue was not a blanket prohibition on opioid/narcotic

medications, the Court finds that it was not unconstitutional as written and Mr.

Quigg's motion for summary judgment on this basis should be denied.

## B.  Denial of Medical Care

During his incarcerations at YCDF, Mr. Quigg was on parole but had not yet

been convicted of new crimes or of a parole violation.  Thus, there is a question

whether he was a convicted inmate or a pretrial detainee.  Whether Mr. Quigg was

a "convicted inmate" or a "pretrial detainee" makes a difference as to whether his §

1983 claims arise under the Cruel and Unusual Punishment Clause of the Eighth

Amendment, or under the Due Process Clause of the Fourteenth Amendment.  A

pretrial detainee's (as opposed to a convicted prisoner's) constitutional rights

relative to conditions of confinement (including denial of medical care) are

addressed under the due process clause of the Fourteenth Amendment, rather than

the Eighth Amendment's prohibition against cruel and unusual punishment

applicable to convicted inmates.  *Oregon Advocacy Center v. Mink*, 322 F.3d 1101,

1120 (9th Cir. 2003); *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067-68 (9th

Cir. 2016) (discussing the differing constitutional standards that apply to convicted

inmates as opposed to pretrial detainees) (*citing Bell v. Wolfish*, 441 U.S. 520, 535

(1979) (holding due process requires that a pretrial detainee may not be punished

prior to a lawful conviction)).

The undersigned need not decide whether the Fourteenth Amendment or

Eighth Amendment applies because, under the lesser objective Fourteenth

Amendment standard, Mr. Quigg's claims fail.

The elements of a pretrial detainee's medical care claim against an

individual defendant under the due process clause of the Fourteenth Amendment

are:

> (i) the defendant made an intentional decision with respect to the
> conditions under which the plaintiff was confined; (ii) those
> conditions put the plaintiff at substantial risk of suffering serious
> harm; (iii) the defendant did not take reasonable available measures to
> abate that risk, even though a reasonable official in the circumstances
> would have appreciated the high degree of risk involved—making the
> consequences of the defendant's conduct obvious; and (iv) by not
> taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018); (*quoting*

*Castro*, 833 F.3d at 1071).  "With respect to the third element, the defendant's

conduct must be objectively unreasonable a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Id.*

A difference of medical opinion concerning a course of treatment, however, does not constitute deliberate indifference. *See, e.g., Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) ("[W]here a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law."); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Therefore, Mr. Quigg must show that a defendant caused his injury by "purposely or knowingly" failing to provide adequate medical care, and this failure was "objectively unreasonable."  *Castro*, 833 F.3d at 1069 (*quoting Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73 (2015)).  Showing an officer's actual awareness of the substantial risk of harm is not required, but a pretrial detainee must "prove more than negligence but less than subjective intent—something akin to reckless disregard"  *Castro*, 833 F.3d at 1071; *Gordon*, 888 F.3d at 1125.

It is undisputed that Defendants made an intentional decision to deny Mr.

Quigg opiate pain medications and there is an issue of fact regarding whether that decision placed Mr. Quigg at risk of continuing to suffer significant pain. Defendants argue Mr. Quigg did not suffer from a serious medical need and therefore was not at risk of suffering serious harm.  They argue his chronic use of opiates was not driven by a serious medical need but rather subjective chronic back pain for which opiates or narcotics are not medically necessary or indicated. (Medical SUF at ¶ 93.)  Mr. Quigg testified that he suffers from a number of painful medical issues and suffers from unrelenting, continuous, severe, chronic pain from several sources associated with his medical conditions.  (Quigg Declaration, Doc. 106-1 at ¶ 2.)  Out of an abundance of caution, the Court finds a triable issue of fact regarding whether Mr. Quigg is suffering from a medical need such that he was at a substantial risk of suffering serious harm

There is, however, no genuine issue of material fact that Defendants took reasonable available measures to abate that risk.  Mr. Quigg was incarcerated at YCDF for a total of 62 days.  Upon his arrival on both September 15, 2015 and December 29, 2015, he went through an initial intake and it is undisputed that he did not exhibit any signs of severe pain or withdrawal at either intake.  Defendants' expert testified that Mr. Quigg's vitals and clinical presentation on the night of September 15, 2015, were not consistent with someone who was experiencing opioid withdrawal (and had not taken their medication since early that morning) or

severe pain.  Mr. Quigg contends that the MsContin medication was a time-release tablet designed to last longer than immediate release tablets.  (Quigg SDF, Doc. 139 at 16.)  Defendants' expert contends that had Mr. Quigg been experiencing severe pain, objective pain behaviors such as frowning, grimacing, and rapid blinking would have been present and evident at the time of his initial intake given the fact he had not taken medication since that morning, as would signs and symptoms of withdraw.  (Medical SUF at ¶ 24.)

The only symptom consistent with withdrawal reported by Mr. Quigg was diarrhea during Incarceration One.  NP McMunn testified that typical symptoms of inmates that withdraw from higher doses of MS Contin or Percocet including acute anxiety, prolonged heart rate, or seizures.  (Doc. 99 at ¶ 22.)  There is no evidence that Mr. Quigg experienced any of those symptoms while incarcerated at YCDF.

Medical providers at YCDF responded to Mr. Quigg's reports of diarrhea, his request to extend omeprazole for gastrointestinal issues, and to start loperamide.  Based upon this documentation it appears that the medical providers were attentive to what might be construed as withdrawal symptoms.

There is also a lack of evidence supporting Mr. Quigg's assertions that he was suffering severe pain such that Defendants were unreasonable in not providing the particular medications he requested.  As pointed out by NP McMunn there is no evidence that Mr. Quigg discussed his pain with correctional officers or others,

there is no record of medical kites reporting severe or debilitating pain.  The record

indicates he submitted one medical request on September 16, 2015 seeking his pain

medications, but he did not specifically complain of current pain issues.  He only

stated that if he didn't have his medications he would have difficulty moving due

to pain.  (Doc. 96-6.)  Mr. Quigg complained more during his second incarceration

on December 29, 2015 (Doc. 96-12), January 1, 2016 (Doc. 96-13), a grievance

sometime in January 2016 (Doc. 93-9), and he complained such that the USMS

service requested information regarding his medications (Doc. 106-2).  But during

his second incarceration he was scheduled to see a provider within two weeks of

intake.  He was examined by a physician's assistant and an M.D. both of whom

determined that the medications Mr. Quigg was requesting were not medically

necessary.

     Mr. Quigg alleges Defendants refused to provide him medications which had

previously proven effective for him.  Such allegations, however, are is insufficient

to establish a denial of medical care claim.  "A difference of medical opinion

between a prisoner-patient and prison medical authorities regarding treatment does

not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th

Cir. 1981).  Therefore, the fact that Mr. Quigg disagrees with Defendants' decision

not to provide him with specific pain medications does not plausibly support a

Fourteenth Amendment claim.  Instead, "to prevail on a claim involving choices

27

between alternative courses of treatment, a prisoner must show that the chosen

course of treatment 'was medically unacceptable under the circumstances,' and

was chosen 'in conscious disregard of an excessive risk' to the prisoner's health."

*Toguchi*, 391 F.3d at 1058 (alteration omitted) (*quoting Jackson v. McIntosh*, 90

F.3d 330, 332 (9th Cir. 1996)).  That is, Mr. Quigg must demonstrate that

Defendants' decision to offer alternative medications instead of the medications

Mr. Quigg preferred was medically unacceptable and done in conscious disregard

to Mr. Quigg's health.

The undisputed evidence is that Mr. Quigg presented on both September and

December 29, 2015 at YCDF with prescriptions for opioid medications.  He was

not given those medications at any time during his stay at YCDF after requesting

them from Defendants.  But Mr. Quigg was never at the YCDF for a period of

more than 23 days.  During his first incarceration, Mr. Quigg was not given his

opioid medications, but Defendants treated him for withdrawals symptoms and

aside from the September 16, 2015 medical request, there is no evidence that Mr.

Quigg made any complaints of pain.

During the second incarceration, he was offered alternative medications

which Mr. Quigg refused to even try.  Mr. Quigg failed to present evidence to

establish that the medications offered were medically unacceptable or done in

deliberate indifference of Mr. Quigg's medical needs.

28

The Court also notes that Mr. Quigg had not been prescribed narcotic pain medications since December 29, 2015 (a year and a half before coming under Defendants' care).  According, to Mr. Quigg's Complaint filed in this Court in Civil Action No. 18cv86-H-BMM-JTJ, Dr. Rees at MSP also refused to prescribe "effective pain medications."  Mr. Quigg also continued to contend that he has been denied "adequate medications for the effective control of severe, chronic pain" while in the custody of the Federal Bureau of Prisons.  (Civil Action 19cv03146-LTB filed in the District of Colorado; Letter dated October 29, 2019.) Mr. Quigg now represents that the Federal Bureau of Prisons began giving his narcotic/opioid medications in November 2019, but he presented no medical records to this effect.  Given the number of medical providers who refused to give Mr. Quigg the "effective pain medications" he is seeking, there is not a triable issue of fact that Defendants' decision to provide alternative medications instead of the medications Mr. Quigg preferred was medically unacceptable and done in conscious disregard to Mr. Quigg's health.

Moreover, courts have routinely held that the decision alone to provide alternative pain medications does not establish deliberate indifference.  *See Fausett v. LeBlanc*, 553 Fed.Appx. 665 (9th Cir. 2014) (affirming summary judgment for defendants where doctors did not provide Valium ordered in hospital-discharge instructions after spinal-fusion surgery and instead provided substitute medicine

29

and other pain medications); *Gauthier v. Stiles*, 402 Fed.Appx. 203 (9th Cir. 2010) (plaintiff's disagreement with the dosage and type of pain medication administered after surgery not deliberate indifference); *Shiira v. Hawaii*, 706 Fed. Appx. 436 (9th 2017) (affirming summary judgment for defendants who deprived plaintiff of methadone and Percodan but offered over-the-counter pain medication and treatment for potential detoxification symptoms; plaintiff's expert did not testify that offering alternative pain medications would be medically inappropriate); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (reversing denial of defense motion for summary judgment; jail health-care provider's decision to provide synthetic opioid rather to provide opioids or contact the doctor who prescribed the opioids before incarceration was not deliberate indifference); *Brauner v. Coody*, 793 F.3d 493, 497 (5th Cir. 2015) (although plaintiff stated that he required more pain relief than the over-the-counter and prescription medications provided by prison doctors for his undisputed bone infection with open sores, "these are 'classic example[s] of a matter for medical judgment' " and, as a matter of law, do not amount to deliberate indifference); *Hill v. Curcione*, 657 F.3d 116, 123 (2nd Cir. 2011) (district court properly dismissed claim that prison officials were deliberately indifferent in not prescribing medication stronger than Motrin for plaintiff's broken wrist because the medication decision was a matter of medical judgment); *Meuir v. Green Cnty. Jail Employees*, 487 F.3d 1115, 1119 (8th Cir.

2007) (summary judgment properly granted for defendants on inmate's claim that nurses were deliberately indifferent in prescribing Motrin but not medicated mouthwash for bleeding gums); *Tabb v. Veazey*, 2007 WL 951763 (N.D.Ga. March 28, 2007) (district court found that a policy of denying narcotics to inmates in the jail was not unconstitutional because it "did not deny detainees and prisoners the right to obtain [effective] non-narcotic drugs"); *Wesley v. Sayre*, 2010 WL 3398526, *7 (N.D.Cal. 2010) (summary judgment granted in favor of defendants on deliberate indifference claim where they prescribed plaintiff Tylenol with codeine to replace methadone, along with physical therapy, injections for pain, and consultation with a pain specialist); *Thomas v. Coble*, 55 F. App'x 748 (6th Cir. 2003) (affirming dismissal of deliberate indifference claim based upon failure to prescribe requested pain medication where plaintiff had been prescribed pain medications, just not the ones he requested); *Greenman v. Prisoner Health Servs.*, No. 1:10-cv-549, 2011 WL 6130410, at *10 (W.D. Mich. Dec. 8, 2011) ("Plaintiff's preference for narcotics and his dissatisfaction with the non-narcotic pain medications prescribed by [defendant physician] falls far short of supporting an Eighth Amendment claim.").

## V.  CONCLUSION

Defendants met their burden of proving "that there is an absence of evidence to support" Mr. Quigg's claims of denial of medical care under the Fourteenth

Amendments to the United States Constitution. *See Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B). Mr. Quigg, in turn, failed to establish that a genuine issue as to any material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Mr. Quigg simply relies upon his own disagreement with Defendants' treatment. There is a failure of proof concerning several essential elements of Mr. Quigg's claim necessitating entry of summary judgment. *See Celotex*, 477 U.S. at 322. He has not tendered any evidence to establish a genuine issue of material fact regarding his claims of denial of medical care. At most, Mr. Quigg has established a difference of opinion regarding his medical treatment which is insufficient to maintain a Fourteenth Amendment claim. Mr. Quigg provided no evidence to demonstrate that a reasonable jury could return a verdict in his favor. See *Anderson*, 477 U.S. at 248. Defendants are entitled to summary judgment.

Based upon the foregoing, the Court issues the following:

## ORDER

1. Defendant Kelly's Motion to Compel (Doc. 123) is DENIED AS MOOT.

2. Mr. Quigg's Motion to Strike the Motion to Compel (Doc. 129) is DENIED AS MOOT.

3. Mr. Quigg's Motion to Strike (Doc. 141) is DENIED.

4. Defendants Niess, Scott, and Caruso's Motion to Strike Plaintiff's

Declaration in Support of his Position in the Statement of Disputed Facts (Doc.

145) is DENIED AS MOOT.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  Defendants' Motions for Summary Judgment (Docs. 89, 94, 125) should

be GRANTED.

2.  Mr. Quigg's Motion for Partial Summary Judgment (Doc. 104) should be

DENIED.

3.  The Clerk should be directed to enter judgment and close this matter.

4.  The Clerk of Court should also be directed to have the docket reflect that

the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate

Procedure that any appeal of this decision would not be taken in good faith.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations

within fourteen days after service (mailing) hereof.[1]  28 U.S.C. § 636.  Failure to

timely file written objections may bar a de novo determination by the district judge

---

[1]Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)."  Therefore, since Mr. Quigg is being served by mail, he is entitled an additional three (3) days after the period would otherwise expire.

and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P.  4(a), should not be filed until entry of the District Court's final judgment.

DATED this 24th day of November, 2020.

John Johnston
United States Magistrate Judge